(Judge Laubie of the Seventh Circuit, sitting in place of Judge Marvin.)

In re Disbarment Proceedings v. Vernon H. Burke.

1. An Act may Amount to Misconduct in the Office of an Attorney Without Amounting to a Crime.

An act may amount to misconduct in the office of attorney without amounting to a crime; therefore it is not necessary to show that what the defendant has done amounts to blackmail.

2. No Precise Words are Needed to Convey a Threat.

No precise words are needed to convey a threat. It may be done by innuendo or suggestion, and to ascertain whether language conveys a threat, it must be taken with the circumstances under which it was spoken and the relation between the parties are to be considered, and then if it can be found that the purport and natural effect of the language amounts to a threat, the mere form of the words is unimportant. Any language which conveys with sufficient clearness to be understood, the proposition that a charge will be made, is enough.

3. Belief in Guilt of Party Threatened with Exposure is Immaterial, When.

Belief in the guilt of the party threatened with exposure does not exempt from the threat made if the intent is to extort more than is due, or something that the party has no right to, or more than he has a right to have, for the purpose of gain, or for the purpose of making the party, from whom the payment is made, to suffer; in such case the belief that the crime charged is true is immaterial.

4. Facts Shown by Evidence.

The evidence in the case shows the following facts: That Burke and Dellenbaugh acted jointly and together as attorneys for Mrs. Manning throughout as charged. That there is nothing to show that "Jane Doe" had done anything to wrong Mrs. Manning of the affections of her husband, nor that the parties up to the time of the settlement had ascertained such to be the fact. That the object in demanding the money was not to obtain compensation for a just claim, but to get as much as possible under the threat of exposure and a promise of protection if payment was made. That "Jane Doe" paid the money to shield herself from an open scandal. That the divorce was granted without sufficient evidence. That Burke drew the entry presented to the Clerk by Dellenbaugh, and that Burke was cognizant of what Dellenbaugh did in order to get it upon record. That this transaction was one intended to carry out a private agreement of the parties and that in doing this they were willing to and pervert and use for this unlawful purpose the courts of the state of Ohio.

Caldwell, J.

In this matter two charges have been made against Vernon H. Burke.

First, with having been guilty of misconduct in office as an attorney-at-law of the state of Ohio, and

Second, with having been guilty of unprofessional conduct involving moral turpitude.

Under these charges are three specifications:

The first is, that Vernon H. Burke and one Frank E. Dellenbaugh on January 1, 1895, and thence afterwards at all the dates and times mentioned and thence continuously thereafter to the present time were and still are, each of them, attorneys-at-law of the state of Ohio licensed as such and practicing as such attorneys in the county of Cuy-

ahoga and state aforesaid and in this Honorable court. That on or about January 30, 1895, said Frank E. Dellenbaugh as such attorney was duly employed and retained in his capacity as such attorney in said county, by one Edith Manning of said county, then the wife of George A. Manning, to render to her his professional assistance and advice in relation to matters growing out of alleged illicit relations then and theretofore and thereafter existing between the said George A. Manning and one "Jane Doe," of said county, and to obtain evidence of said relations, and to advise in relation to legal proceedings to be taken upon obtaining said evidence, and to prosecute such legal proceedings. That thereafter, about April 22, 1895, said Frank E. Dellenbaugh was appointed and qualified and assumed the office and duties of judge of the court of common pleas of the Third sub-divisions of the Fourth Judicial District of the state of Ohio, and thereafter and during all the time hereinafter mentioned, the said Frank E. Dellenbaugh continued to be and act as such attorney for said Edith Manning in said matters, under his said employment and retainer; but desiring to conceal the fact that he still was, and was still acting as such attorney-at-law in said matter for said Edith Manning, he did on or about July 1, 1895, solicit and procure said Vernon H. Burke as such attorney-at-law to become the ostensible attorney for said Edith Manning in said matter, and to render the professional assistance and advice to said Edith Manning in and about said matter.

The said Vernon H. Burke as such attorney, then well knowing all and singular the premises aforesaid by the solicitation and procurement, and as the agent of said Frank E. Dellenbaugh as such attorney-at-law, did on or about the first day of July, 1895, accept such employment, retainer and agency, and thereupon as such attorney-at-law, and by the solicitation, procurement and at the request and as the agent of said Frank E. Dellenbaugh on or about July 6, 1895, in his professional capacity as attorney at law, did wrongfully, corruptly and unprofessionally threaten the said "Jane Doe" to publish and expose said illicit relations between her and the said George A. Manning and thereby to bring scandal and disgrace upon her, the said "Jane Doe," and did then and there agree with the said "Jane Doe" that in the event that she paid the sum of money then demanded of her, to wit: ten thousand dollars, that she should be shielded and protected from exposure and disgrace and her name suppressed and concealed in case divorce proceedings were thereafter commenced by said Edith Manning against her husband George A. Manning, and by means of said threats and said agreements the said Vernon H. Burke did then and there gain and receive from said "Jane Doe" on or about July 8, 1895, the sum of five thousand dollars in cash and her promissory notes, one for the sum of two thousand dollars, payable in ten days after that date, and six promissory notes for the sum of five hundred dollars each, and payable respectively in three, six, nine, twelve, fifteen and eighteen months from said date, all of which notes were afterwards paid, and the said Vernon H. Burke did charge and receive as a professional fee for said acts the sum of $3,300.00, and on July 8, 1895, at said county, did pay $1,000.00 thereof and on July 18, $100.00 thereof, to the said Frank E. Dellenbaugh. He, the said Vernon H. Burke, then and there did all of said acts by him done as aforesaid, in the manner aforesaid, for the sake of gain and to conceal the fact that the said Frank E. Dellenbaugh was interested, retained,

employed or concerned in said matter while being such judge, as afore-said.

Now, considering the evidence under this specification given in the Dellenbaugh case, we said that as to the time when Judge Dellenbaugh employed Burke in the case, there was some doubt; the preponderance of the evidence tending to show that Judge Dellenbaugh employed Vernon H. Burke to act as attorney in the case on or about July 1, 1895. There was in that case some evidence introduced tending to show that Judge Dellenbaugh employed Vernon H. Burke in the case as early as the latter part of April, 1895, and that he himself had nothing to do with the procurement of the money as alleged in the specification after the time of the employment of Vernon H. Burke, and this evidence tended to show that after the employment of Burke in the latter part of April, Dellenbaugh took no active part in the case so far as obtaining this money is concerned. Upon this state of evidence in that case, we held that the specification was not so clearly made out as against Judge Dellenbaugh that we could say that it was proven beyond a reasonable doubt, that it was clearly and satisfactorily proven, although we did determine in that case and so announced, that the weight of the evidence was that Judge Dellenbaugh remained in the case until after the settlement was made and the money received, and until all the acts charged under specification one to have been done by Dellenbaugh and Burke were completed. We were satisfied in that case without any doubt that Judge Dellenbaugh did receive the $1,100.00 of the money received from the party named in the specification as alleged therein, as one-third of the fees received by him and Burke for the procurement of the money.

As the evidence now stands before us in this case, Judge Dellenbaugh is not on trial in this hearing, and the evidence that raised the doubt in the minds of the court is not now before us, but as the matter now stands in this hearing, the evidence shows that Judge Dellenbaugh and Vernon H. Burke acted jointly and together as attorneys for Mrs. Manning throughout as charged in the first specification. I mention this matter here because in treating the evidence now before the court, it must be treated as though Dellenbaugh and Burke acted together in all that is charged to have been done under specification one. And while thus treating the testimony, we would not have it inferred that we mean to say by so treating it that Judge Dellenbaugh, as a matter of fact, was fully and completely connected with all the acts charged in specification one, but only as bearing upon the character of the acts of Vernon H. Burke under said charge.

I will not undertake to rehearse here all the testimony connecting Vernon H. Burke with the acts and things named in the specification which I have recited, but only such testimony as is necessary to determine the nature and character of the act or acts which the testimony shows him to have done, and the part which he has shown by the evidence to have taken in the procuring of the money named in the specification.

The evidence shows in this case, that a party by the name of Hickox went to Judge Dellenbaugh sometime in the spring of 1895 and told Judge Dellenbaugh that Mrs. Manning desired to have him take for her a case for divorce against her husband, and it was there arranged between Judge Dellenbaugh and Mr. Hickox that Mrs. Manning should come in and see Judge Dellenbaugh. Mrs. Manning on the next day appeared in the office of Judge Dellenbaugh and Judge Dellenbaugh took her case. Judge Dellenbaugh set about procuring evidence of the re-

lations between George A. Manning and the lady known as "Jane Doe" in this case, and proceeded for sometime without calling a detective; but sometime in April, 1895, he called to his aid the detective Mr. Christian. Mr. Christian put different persons who were in his employ, upon the case and certain evidence was obtained as to the relations between these parties. In the first part of July, 1895, after Mr. Christian had obtained the evidence above referred to, Dellenbaugh, Christian and Burke had a meeting at the Kennard House in Cleveland, in which it is testified by Mr. Christian, Dellenbaugh said that Christian had done a good thing, and that the matter was now ripe and that something should now be done to bring the matter to a conclusion, and he said to Christian that on account of his being on the bench, he could not write a letter to the lady in question, and asked Christian whether he, Christian, should write the letter, or whether Dellenbaugh should have Vernon write the letter. That same day or the day following Burke had a conversation with Dellenbaugh to this effect, as narrated by Mr. Burke: "He, Dellenbaugh, told me that it was a good matter, and he would arrange to turn it over to me; he didn't know definitely whether he could turn it over to me or not, but he would see the parties; they would be down in a day or two, and then he would let me know. He didn't tell me what the nature of it was at that time, at least he didn't tell me the names of the parties nor the facts."

On July 5, 1895, Mr. Burke met Judge Dellenbaugh again in the court room proper, the large room, and Mrs. Manning and Miss Kent were in the Judge's private room, Burke says that the judge related then to him the facts—"And told me all about who Mrs. Manning was, who Mr. Manning was, and who the other party was. He told me that there was a good claim there, that we ought to get considerable money out of it. He said he had taken occasion to look the party up and she was worth any way twenty thousand dollars. After a little talk of that sort, Judge Dellenbaugh took me into the private room in No. 7, the private room; he introduced me to Mrs. Manning and Miss Kent. We then had a conversation in reference to the facts, Judge Dellenbaugh doing practically all the talking. Judge Dellenbaugh reiterated what he had already said about Mr. and Mrs. Manning living happily together before this woman came between them, and he said that this woman had been watched and detectives had followed her to different places, told me various places that he had followed this woman with Mr. Manning; spoke about finding them out at a place by the name of Russell Glen in Glenville; told me about Mrs. Manning and some other woman, I don't know whether it was a Mrs. Robinson or who she was, going down from his office to the place where this woman was located, and finding Manning there, and also told me that Mrs. Manning had been ruined and what a good woman she was. The Judge said that this woman ought to pay twenty thousand dollars Mrs. Manning insisted that she ought to pay twenty-five thousand dollars. The judge said that I should not neglect this, that I should take hold of it and rush it right through; that I had better go down and see if I could see her then. I left the judge and Mrs. Manning and Miss Kent in the private room off No. 7 and went directly down and saw this other party. I was gone probably half an hour. I came back, the Judge was there, and I stated to them that I went down as the judge had told me, and talked with her about it; charged her with those different things some of which she admitted, and one of

which she denied. The 'Russell Glen' matter she said was not true. I said that she said she couldn't raise twenty thousand dollars. In the first place, as I remember; I said that she wanted to settle; she told me that she wanted me to see Mrs. Manning and see if it could be settled, and wanted to know what it could be settled for. I told her that I didn't think it could be settled for less than twenty thousand dollars. She said she couldn't raise that, she didn't have it; and she said if she had time she might get half of it, ten thousand dollars, but she couldn't raise even five thousand dollars now without selling some stock and disposing of some of her jewels. When I told the judge that, he said it was not so, that she had twenty thousand dollars, he knew that. Then I told him, no, I didn't think so 'I am satisfied that this woman wants to settle this law suit; I don't believe she has got it. She said she would have to sell some stock and her jewels in order to raise five thousand dollars.' Mrs. Manning said that she understood she had twenty-five thousand dollars and she wanted all she had. I said I was satisfied that if she raised ten thousand dollars, that was all she could raise. I told them that she had agreed to be at my office in the morning and wanted to know whether Mrs. Manning would take the proposition of ten thousand dollars or not. Finally the judge said, to take it, and have her pay five thousand dollars down; that her notes were perfectly good; that if she paid five thousand dollars, she certainly would not let her notes go to protest. With that the judge and I walked out of the room. There the judge said to get this thing settled up, not to neglect it, but to get it settled up in the morning right away, and he said 'whatever settlement you make, and you can get ten thousand dollars from her, you take one-third of it, and out of it I will take one-third, and you may have two-thirds;' and I said 'that is perfectly satisfactory to me'.''

Just prior to the publication of this matter in the World, Burke had a conversation with Judge Dissette in which he went over the facts quite extensively, connected with this specification, as well as some of the facts connected with the other specifications, and Judge Dissette's testimony is to the effect that Burke went on and related to him his first connection with the case in the early days of July, 1895, and narrated the conversation held at the Kennard House, and went in detail over all the facts of the entire matter; and in that conversation, Judge Dissette swears that Burke told him that Judge Dellenbaugh instructed him to go down and see the party and to strike her for twenty thousand dollars. That he had looked up her financial standing, that she was worth twenty thousand dollars, that he should strike her for that amount. Burke said, ''I went down from the court room to see the party and told her what my business was, told her something about what the detectives had said and talked with her, and she collapsed; she was all broken up. She protested that it would ruin her; that if this thing got out it would be her ruin, and he said that after a while she said that she could not afford a scandal, said she hadn't been at the house of assignation or prostitution where they had charged, that she hadn't been there at all, but she could not have this scandal; she couldn't have it get out. Burke said to her that he was not prepared to say whether Mrs. Manning would consider a proposition of settlement at all, but she immediately said, 'How much do you think it would take to settle it,' and Burke said 'I don't know whether Mrs. Manning would consider a proposition of that kind, but I think about twenty thousand dollars,' and the party said she

couldn't pay twenty thousand dollars, she couldn't pay it; she couldn't raise that much money, but if they would give her a little time she could raise ten thousand dollars just about half of it; and then went back to Judge Dellenbaugh with that proposition, and finally they concluded to taken ten thousand dollars and they got ten thousand dollars.'' And Judge Dissette said to Burke, ''Why, Vernon, that was a cold blooded piece of business.'' He said, ''It was; it was the coldest blooded thing I ever was engaged in. I have been sorry for that little woman ever since, because she protested that she was innocent of that offense that was charged.'' And in that conversation as narrated by Judge Dissette, Burke told him of the final settlement of the matter, of the payments made, and of the division of $3,300.00 of $2,200.00 to Burke and $1,100.00 to Dellenbaugh, and narrated the whole matter.

Mr. Burke in his testimony in the Dellenbaugh case put somewhat of a different version upon the conversation he had with ''Jane Doe'' from what he did in his testimony before the trial committee or from what he did in his conversation with Judge Dissette. He seems to shade it a little in the direction of tending to show that he represented to ''Jane Doe'' on that occasion of his first visit to her, that she had robbed Mrs. Manning of a husband, had practically taken him away from her, and that Mrs. Manning was about to prosecute her for the alienation of the affections of her husband. In all these conversations narrated by Burke to Judge Dissette, narrated before the trial committee and as narrated by Burke on the Dellenbaugh trial, it appears that the main thing considered by these attorneys and their client at their conversation before going to see this woman and after Burke's return from visiting her, was how much money has she got? How much can we get?' Dellenbaugh said it was a good thing, ''We ought to get considerable money out of it.'' He had looked the party up and she was worth anyway twenty thousand dollars; and as narrated by Burke to Judge Dissette, that she should strike her for twenty thousand dollars. In the first talk with Dellenbaugh and Mrs. Manning, Dellenbaugh said she should pay twenty thousand dollars, and Mrs. Manning said twenty-five thousand dollars. Dellenbaugh said Burke should rush it right through and go down and see her then and hurry the matter up when Burke returned from seeing the woman, he informed Dellenbaugh and Mrs. Manning that the woman hadn't twenty thousand dollars; Dellenbaugh said he knew better; she had twenty thousand dollars. Dellenbaugh wanted to know if Burke had found out anything about her property affairs, and Burke said no, and Dellenbaugh said he knew she was worth twenty thousand dollars. Mrs. Manning then again said that she understood she was worth twenty-five thousand dollars and she wanted all she had. And after they had agreed to take the ten thousand dollars, Dellenbaugh said ''Fix it up tomorrow, right away.''

Now, down to this settlement there had been no petition formed for alienation of affections, nor does the evidence show that any consideration was had between the parties interested as to what the actual damage in the case was. The evidence shows that ''Jane Doe'' was horrified at the idea of a scandal coming out involving her, and the main thought in her mind was to keep the scandal suppressed, and when the next day the matter was settled up between her and Mr. Burke, she exacted from Burke at that time a promise that she should be protected and her name kept out of the paper, or, as testified before the trial committee by Burke ''That she should be shielded.''

The evidence does not show nor is there any evidence tending to show that the parties had up to that time ascertained the facts to be that "Jane Doe" had alienated the affections of Manning at all. From all that appears in this case there is nothing to show that she had enticed him away from his wife, or that anything had been done by her to wrong Mrs. Manning of the affections of her husband.

Under this testimony it becomes the duty of the court in this case to say whether the intent and purpose in getting the ten thousand dollars was to get a reasonable compensation for any injuries that "Jane Doe" may have done to Mrs. Manning, or whether that was entirely ignored, or was of such subordinate consideration that it played no part whatever or but little part in guiding the parties to the amount that should be demanded of "Jane Doe," or the amount that was received from her.

It is clear in this case that so far as "Jane Doe" is concerned, one of the principle considerations, if not the principle consideration for her paying the ten thousand dollars, was to shield herself from an open scandal, and to induce her to part with the money. The promise was made to her that she should be protected and her name kept out of the papers; that her name should in no manner appear in any proceedings that were had for a divorce on the part of Mrs. Manning against her husband.

The question then is, under this testimony, was this demand made purely as a compensation and a reasonable compensation for an injury done to Mrs. Manning by "Jane Doe," or was it the purpose and intent to extort from "Jane Doe" the largest amount of money possible without any regard to the amount of injury actually done?

There is another matter that bars upon this question that goes a long way toward showing the intent of the attorneys who acted in the matter for Mrs. Manning. If they intended to exact only enough money to compensate for the actual injury done and that the ten thousand dollars as an exact equal of the amount that Mrs. Manning had suffered, then it seems very strange that they should take from that amount one-third, or $3,300.00. It is hard to conceive how attorneys could believe that if they had obtained for their client only just dues, how it would be possible for them to charge her one-third of that amount for an amount of work and labor that would not call for fees to the extent of but a small fraction of the amount they received. If the intent was to charge "Jane Doe" $6,700.00 as an equivalent to the amount suffered by Mrs. Manning, and enough more to pay her attorneys a reasonable fee, then certainly demanding and receiving $3,300.00 for such services would be an extortion that could never be justified by any court.

The evidence under these specifications cannot fail to impress a court that the line of action mapped out by the parties after getting their facts, was this: Dellenbaugh said, "Now, Burke, you go over and strike her for twenty thousand dollars. This with the rehearsal of the accusations, will paralyze her and before she can recover from the shock, rush her, before she has time to regain deliberation or get counsel, in a settlement for that amount." Burke went; he struck her for twenty thousand dollars; she collapsed; he tried to push her into the contemplated settlement, and the only reason why she escaped with only ten thousand dollars was because of her inability to raise the twenty thousand dollars and her plea for mercy touched a tender spot in Burke's heart and he pitied that poor little woman. No attempt is made by Burke's counsel to justify that part he took in this action. The only plea on his behalf

is by way of an apology for his conduct. It is said that he was the dupe of another and much older lawyer and was made to believe the part he took was justifiable, and a powerful plea is made for mercy because of his ignorance and the influences of his superior over him. This plea does very great injustice to the intelligence of Mr. Burke. It was not the intellect that was at fault.

Our conclusion in this matter is, that in demanding this money no regard whatever was had to the amount of any just claim that existed against the party from whom it was demanded, but the only object and purpose was to demand and receive all that it was possible to get under an implied threat at least, that if the same was not paid, she would be exposed, and under the direct promise that if she paid the same, she would be protected and shielded and her name in connection with the affair kept from the public. This being true, the intent was an evil one, was a wrong one, and the act is one that cannot be justified, and the defendant Burke is guilty as charged in specification one.

But it is urged on behalf of the defendant that this does not amount to blackmail, and that if they believe the charges against "Jane Doe" were true, that the defendant cannot be found guilty in this action. This raises two questions of law, and before proceeding to consider these two questions, I will say that it is not necessary in an action of this character, to show that the defendant has committed a crime known as blackmail, but all that is necessary is to show that he has been guilty of unprofessional conduct in his office as an attorney, or of unprofessional conduct involving moral turpitude. And an act may amount to misconduct in the office of attorney without amounting to a crime. It is insisted on behalf of defendant, that he made no threats to "Jane Doe" at the time that he first visited her nor at any other time, and that the specification is not true that the money was obtained by threats, but, on the contrary, the language used is insisted, shows that he did nothing more than to state to her the facts, and that the proposition to settle the matter up came from "Jane Doe," and the proposition that she made was accepted, and that is all that the defendant had done in this case, and that does not amount to threats or to extortion.

As we understand the law bearing upon this, no precise words are needed to convey a threat. It may be done by innuendo or suggestion, and to ascertain whether language conveys a threat, it must be taken with the circumstances under which it was spoken and the relations between the parties are to be considered, and then if it can be found that the purport and natural effect of the language amounts to a threat, then the mere form of words is unimportant. Any language which conveys with sufficient clearness to be understood the proposition that a charge will be made is enough. The threat may be bluntly spoken or it may be thinly veiled in suggestive terms. Now, if it is necessary to prove a threat couched in so many words, then perhaps the language used by the defendant on this occasion might not amount to a threat. But if it is sufficient to show that by any form of expression actually used such a proposition was intended to be conveyed and was so understood, then the threat appears ample for the action. There are many cases bearing out this view of the law: Regina v. Menage, 3 E. & F., 310; People v. Thompson, 97 N. Y., 313; Moore v. People, 69 Ill. App., 398; People v. Choynski, 95 Cal., 640; People v. Toneille, 81 Cal., 275; People v. Gillian, 50 Hun., 35.

Under these authorities and under what I have said heretofore in regard to the facts under this specification, it most clearly appears that what was said on the occasion of this interview taken in connection with the surrounding circumstances as well as what took place immediately thereafter, this entire interview amounts to a threat, and that the object and purpose of the threat was to extort money.

The next proposition to be considered, is, whether, admitting that the parties believed that "Jane Doe" was guilty of the acts of which she was threatened to be exposed, does that belief exempt the defendant from the threat he made? This question has been considered by the Supreme Court of the state of Ohio, in a manner that bears more or less directly upon the facts in this case. I refer to the cases, Elliott v. State, 36 O. S., 318, and of Mann v. State, 47 O. S., 556. In Commissioners v. Coolidge 128 Mass., 35, the trial court was asked to charge these two propositions:

"First. That the jury must find that the defendant must have maliciously intended to obtain that which in justice and equity he knew he had no right to receive.

"Second. That if defendant believed that Chapin actually owed him the sum of ten dollars when he wrote the letter, he is not guilty of the offense charged."

The court in reviewing these letters, held:

"The trial judge properly refused these charges." and held further that "the trial judge was right when he said: the law did not authorize the collection of just debts by maliciously threatening to accuse the debtor of a crime; that it is proper to say that a threat made by one who is accused, whose goods have been stolen, that he would prosecute the supposed thief for the offense if there were grounds to suspect him to be guilty, could not be considered as made maliciously and with intent to extort money, unless there were other proofs of malice and intended extortion." Motsinger v. State, 123 Ind., 498, is to the same effect. As I understand the cases above referred to in our own state as well as others, the rule laid down in this: That if a party demands from one who has his property or is indebted to him the amount that is due him or his property to be returned to him, and threatens if it is not done he will commence proceedings against him either for the debt or for the wrongful taking of the property, that there is no intent in such communication to extort money, but simply to receive what is due. But, on the other hand, if the intent is to extort more than is due, or something that the party has no right to, or more than he has a right to have, for the purpose of gain, or for the purpose of making the party from whom the payment is made to suffer, then whether or not the party believes the crime or act charged is true or not, is immaterial. People v. Eichler, 75 Hun., 27; People v. Wightman, 43 Hun., 358.

We see in these propositions of the law no obstacle in the way of holding in this case that the threat made and money demanded was an extortion without any reference to any just sum of money due, and was made for the purpose of gain, and that therefore the law as well as the facts warrant us in holding as we do, that the defendant is guilty as charged in the first specification.

The substance of the second specification is, that said Vernon H. Burke and one Frank E. Dellenbaugh on January 1, 1895, and thence forward at all the dates and times hereinafter mentioned and thence continually thereafter to the present time, were each attorneys, as alleged

in the first specification. Then it narrates the facts as detailed and found in the first specification, and then proceeds in substance as follows: That said Frank E. Dellenbaugh and Vernon H. Burke agreed and promised "Jane Doe" that they would shield and protect her from exposure in any divorce proceedings that might be begun by Edith Manning against her husband George A. Manning, and for the purpose of carrying out that promise, said Burke did wrongfully, corruptly and unprofessionally in conjunction with the said Frank E. Dellenbaugh as such attorney-at-law and for the accomplishment of the ends, objects and purposes as aforesaid, draft a petition for divorce in behalf of Edith Manning against her husband, George A. Manning alleged herein in substance as ground for a divorce, only that the said George A. Manning had failed to furnish the necessaries of life for the year preceding to the said Edith Manning, but not alleging that he was able to do so nor that he had been guilty of gross neglect of duty, and further alleging that the said George A. Manning had used towards the said Edith Manning abusive and disrespectful language but not alleging what the language was, nor that it was used in the presence of others, nor that it occasioned her bodily ill, nor that it amounted to extreme cruelty, and further alleging that as the only other ground for a divorce, that the said George A. Manning had at divers times and places in the city of Cleveland to said Edith Manning unknown, committed adultery with divers persons to Edith Manning unknown, praying for a divorce and the restoration of plaintiff's maiden name, and in conjunction with the said Frank E. Dellenbaugh, for the further and more successful attainment of the purposes aforesaid, signed the name of another attorney-at-law, to-wit: George N. Webster, to said petition, and to the precipe thereon, although the said George N. Webster was not the attorney in said cause and had nothing whatever to do therewith, and did thereafter, on July 25, 1895, file said petition and precipe with the clerk of the court of common pleas of Cuyahoga county, Ohio, and procured the issuing and service of the summons thereon with a certified copy of the petition therein upon the defendant therein, George A. Manning, and did in conjunction with said Frank E. Dellenbaugh and in further prosecution of the said purposes, and to prevent the publicity of said action; did prevent the making of any entries in said cause, excepting only the serial number thereof upon the Appearance Docket of said court, or upon any of the dockets or calendars of said court, and did procure the sheriff of said Cuyahoga county to make no entry of said suit or his doings therein upon the books kept in his office as by law he was required to do, and did further in conjunction with the said Frank E. Dellenbaugh, make a secret agreement with the said George A. Manning as to the amount of alimony to be paid by him, and did thereafter in conjunction with the said Frank E. Dellenbaugh, procure said cause to be advanced for trial by the said Frank E. Dellenbaugh as such Judge, in violation of law and the rules and practice of said court, without written motion, affidavit or notice, and without any good cause therefor, or for any cause other than the desire of said Vernon H. Burke and Frank E. Dellenbaugh to have said cause heard by said Frank E. Dellenbaugh pretending to act as such Judge in said cause before his term of office expired, and which term of office would and did expire on November 2, 1895, said case not being in order for trial in its order on the docket as required by law until long after that date, and he did further, in conjunction with the said Frank E. Dellenbaugh, on October 28, 1895, at said county, procure said cause to be heard by the

said Frank E. Dellenbaugh pretending to act as such judge, therein, secretly, upon incompetent and insufficient evidence, and without any evidence of the adultery of the defendant George A. Manning, and in conjunction with said Frank E. Dellenbaugh, did in further pursuance of said purpose and design, cause and procure an entry to be made dated of October 28, 1895, by said Frank E. Dellenbaugh, who was then and there pretending to act as such judge therein, upon the file wrapper made to contain the papers on file in said cause in said court, which entry upon the said file wrapper was signed by said Frank E. Dellenbaugh, as such judge, and dated October 28, 1895, and to the effect that said cause had been heard on said day by said Frank E. Dellenbaugh, as such judge, that the allegation of the petition had been found by the court to be true, and that the prayer of the petition had been granted and plaintiff had been restored to her maiden name all of which was done wrongfully, corruptly and unprofessionally by the said Vernon H. Burke, as such attorney-at-law, and for the purpose the better to assist the said Frank E. Dellenbaugh to accomplish the purpose of his retainer and employment as attorney-at-law, for Edith Manning and to conceal the fact that the said Frank E. Dellenbaugh, while such judge, was the real attorney for Edith Manning in said matters.

The evidence under this specification shows that a short time before July 25, 1895, Judge Dellenbaugh said to Mr. Burke that Mrs. Manning desired to have a divorce, and that he should proceed at once to draw a petition and that they talked over the nature and character of the petition, and petition was drawn as set forth in the specification as there arranged between them. That they then talked over between themselves the importance of carrying out the arrangement with "Jane Doe," that this entire matter should be kept private, and accordingly it was suggested by one or the other that some stranger should sign the petition, and accordingly the name of Webster was attached to the petition as attorney when it was drawn. The matter of keeping the petition and all reference to it on the books of the clerk of the court and of the sheriff in such a manner that nothing should appear thereon that would give any one any clue to this action of divorce, was talked over between them and arranged that Burke should procure the case to be so entered in the books. The petition was filed; nothing appeared upon the books in either office to show that any such action was pending, and the books continued so until after the divorce was granted, and until the time when the decree appeared in court to be entered. A short time before Judge Dellenbaugh was about to leave the bench, he notified Mr. Burke that if the case was to be heard before he left the bench and heard before him, that he must hurry up and hear it. A very short time after that Mrs. Manning informed Burke that the case had been set down for hearing on October 28, 1895. The evidence in the case shows that Burke at this time did not know that the case had been set down for hearing, that he had filed no motion to have it advanced, he had taken no steps in the matter looking to a trial of the case before Judge Dellenbaugh left the bench. On October 28th, the day the case was set for trial, late in the afternoon of that day, Mrs. Manning and Miss Kent appeared in the court room, but Burke was not there. Burke was notified at his office to come to the court room at once. He went; when he arrived there, he found Judge Dellenbaugh, Mrs. Manning and Miss Kent in the room. Judge Dellenbaugh at once repaired to his private room and asked the three persons present to go in there with him. After entering the private room,

he entered upon the hearing of the divorce case. No persons were present but the four, Judge Dellenbaugh, Vernon H. Burke, Mrs. Manning and Miss Kent. Miss Kent and Mrs. Manning were sworn and testified. What they testified to before the court does not appear. Mr. Burke seems to fail in memory as to what they said in their testimony on that occasion.

It is hard to conceive how either of them could have testified to the claim of adultery set up in the petition, as the entire evidence in this matter from first to last, shows conclusively that neither Mrs. Manning nor Miss Kent knew personally of any offense under this charge in the petition that Mr. Manning had committed. It clearly appears that in that trial all that the court did was without any sufficient petition, and without any evidence that would warrant the court in granting the divorce. It was not then claimed and it is not now claimed that there was any truth whatever in the first and second allegations in the petition as to the neglect of George A. Manning. When the court was through, all that he did was to make an entry on the file wrapper as set forth in the specification. No other entry was made by the court. The evidence tends to show that the beginning and hearing of this divorce case was for two purposes. First, to procure a divorce for Mrs. Manning, and second, to procure it without anything being known by an one and without leaving trace that any one could follow to determine the fact that such a case was pending or that such a case had been tried and heard and a divorce granted. There could have been no other object or purpose in this great amount of secrecy and private trial and hiding of everything from the records, except to carry out the agreement that had been made with "Jane Doe" that nothing should occur in that divorce case that would in any manner reveal her identity.

Intimately connected with this second specification, is the third specification, which relates to the manner in which the journal entry in this divorce case was gotten upon the court records. It alleges and the proof shows that sometime after Judge Dellenbaugh left the bench in 1895, sometime in 1896, it was ascertained by Judge Dellenbaugh and Mr. Burke that no journal entry was on in the Manning divorce case. Judge Dellenbaugh called Mr. Burke's attention to this fact. Mr. Burke thereupon proceeded to draft a journal entry and took the same to the clerk of the court which was not O. K'd by Judge Dellenbaugh, and asked the clerk to put it on record. The clerk told him he couldn't do that because it wasn't O. K'd, and sent him to Judge Logue to see what Judge Logue would do for him in the matter. Mr. Burke went to Judge Logue and Judge Logue told him that he didn't hear the case and he would not O. K. the journal entry. Thereupon Burke took the journal entry back to the clerk to do what he could to get the journal entry entered upon the journal of the court. The clerk took the journal entry and with Mrs. Manning went to see Judge Logue in regard to the matter, but Judge Logue refused to act in the matter and referred him to Judge Ong. Thereupon the clerk saw Judge Ong, and by this time it became rumored about so that the judges had some intimation that nothing appeared on the books of the court in any way that anyone had ever heard this divorce case, and it was known to the judges that there was nothing on the books in the clerk's office to show that any such case was pending. And Judge Ong with this information, told the clerk not to enter the journal entry of record. The clerk soon thereafter returned the journal entry to Mr. Burke and said to him that the judges would

not permit the journal entry to go on unless it was O. K'd by Judge Dellenbaugh before he left the bench.

Thereupon Mr. Burke notified Judge Dellenbaugh that he was unable to get the journal entry that he had, upon the journal he had exhausted his resources, and although Mr. Burke can not remember all he said to Judge Dellenbaugh on that occasion, yet it does appear that Mr. Burke thereupon drew a new journal entry like the one he had tried to get upon the record, except that the new one contained an order of the court that Mrs. Manning be restored to her maiden name. This journal entry was handed by Mr. Burke to Judge Dellenbaugh. Soon after this second draft of the journal entry was handed to Judge Dellenbaugh by Burke, Judge Dellenbaugh went to the clerk of the court and presented him a journal entry that corresponds in every word and particular and is a fac simile of the second journal entry that Mr. Burke drew as shown by the stenographer's minutes to whom Mr. Burke dictated the journal entry, and the court does not hesitate to find in this case that that journal entry presented to the clerk by Judge Dellenbaugh was the identical journal entry that Burke drew as the second entry and the one that he drew after he failed to get his first draft on the records. When this journal entry was presented to the clerk by Judge Dellenbaugh, it had upon the face of it in red crayon, "O. K. Dellenbaugh, Judge." After the clerk looked at the entry and saw that it was thus O. K'd., he said to Judge Dellenbaugh, "When did you O. K. this journal entry?" Judge Dellenbaugh said it was the day or the day after he had heard the case and before he left the bench. The clerk thereupon said "Why, this obviates the entire objection that has been made to the journal entry going on in this case," and thereupon the clerk put the journal entry upon the record.

It appears in evidence further that sometime in the fall of 1896, Judge Dellenbaugh was candidate for the bench again, and was running for that place, and there was some talk got out in regard to this journal entry and it was then talked over and agreed between Dellenbaugh and Burke that if anything was said about the matter that they were to represent that the journal was done all right at the time of trial or very soon thereafter, and that Burke had sent the Journal entry over to the clerk by a boy, who instead of leaving it with the entry clerk had left it with the file clerk and it had got in the files and it had been thus mislaid.

It is not conceded that there were no facts to warrant the telling of any such story, but it is claimed by Judge Dissette that in the conversation he had with Burke just prior to the publication in the World in which Judge Dissette was asking him about this journal entry, and whether the Manning case has ever actually been tried or not, Mr. Burke then told Judge Dissette he had drawn the journal entry and sent it over by a boy and it had got into the files without being entered upon the records.

The effect of this testimony under the second and third specifications is this: that Mr. Burke knew that he had no petition in that case that would authorize any court to proceed to trial upon the same. He knew that he was proceeding before a court that had no authority whatever to try that case. He knew the court was prohibited by statute and by all authority of law from trying a case with which he had so much to do before he went upon the bench. Burke knew—he must have known, that there was no evidence produced by any person present that was competent to testify upon the matter of the adultery of George A. Mann-

In re Disbarment Proceedings v. Vernon H. Burke.

ing. He knew when he got the journal entry or was seeking to get the journal entry in the record of the case, that if the real facts of the way in which the case was commenced, after a consultation between himself and the Judge who tried the case as to what should be in the petition, that the petition sould be so meagre as to be entirely insufficient, and that the evidence was insufficient, that any judge who became acquainted with these facts and who then had charge of the records of the court and control over them, would refuse to allow that journal entry to go upon the records. And this all for the purpose and only conceivable purpose of carrying out the arrangement that he made with "Jane Doe" at the time that he obtained the ten thousand dollars from her. He knew when he handed the second draft to Judge Dellenbaugh that it would be impossible to get that draft upon the record without its being made to appear to the clerk or the judges then upon the bench, that that journal entry was O. K'd by Dellenbaugh when he was upon the bench. And this conspiracy between Judge Dellenbaugh and Mr. Burke as to the commencing of this action, as to the trying of it, and as to the getting the journal entry on in such a way that nothing should be known in regard to 'Jane Doe" in connection with the entire matter, is sufficient to warrant us in holding that all that Judge Dellenbaugh did in O. K.-ing that journal entry, long after he had left the bench, and all that he said and did to the clerk to get it or record was well known to Mr. Burke. It is the act of one conspirator in direct line of the purposes and inteations of both conspirators to accomplish an end, and we think is sufficient to enable us to say that Mr. Burke was equally responsible with Judge Dellenbaugh in getting the journal entry on by false representations made to the clerk.

Had Mr. Burke bribed the judge to do for him all that Judge Dellenbaugh did in this divorce case to further his ends and purposes, no one would hesitate for a moment as to his guilt. Had he persuaded the judge by false representations or by untruthful statements to do what Judge Dellenbaugh did in that case, no one would doubt as to his guilt. How much less is his guilt if he co-operates and connives with a judge who is on the bench in a scheme that is intended to further the objects and purposes of both of them if he commences and action, goes to trial upon it; and procures the entry of the journal entry as was done in this case?

We see no way under the evidence in this case of looking upon this transaction except as one intended and executed for the purposes of carrying out a private arrangement between the parties to the action and the party from whom they had obtained money. And in order to do this, they were willing to and did pervert, and use for this unlawful purpose the courts of the state of Ohio. To thus use the courts of the state is certainly a wrong that should not, and cannot be overlooked.

We find that Mr. Burke is guilty as set out in both charges of the complaint in this proceeding.

*John. G. White, Alex. Hadden, A. T. Hills, Wm. B. Sanders,* and *E. J. Blandin,* for Prosecution.

*M. A. Foran,* and *Mr. Bailey* for Defendant, Burke.