1998 ND 5

**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Lundy CONLEY, Defendant and Appellant.**

**Criminal No. 970092.**

Supreme Court of North Dakota.

Jan. 20, 1998.

Gregory Ian Runge (argued), Bismarck, for defendant and appellant.

MESCHKE, Justice.

[¶ 1] Prisoner Lundy Conley appealed from a criminal judgment entered on a conditional guilty plea to possession of contraband useful for escape from prison. We conclude Conley was in custody when twice questioned at the prison, but he was not informed of his constitutional rights, so incriminating statements made by him cannot be admitted at his criminal trial. We reverse and remand to allow Conley an opportunity to withdraw his guilty plea.

I

[¶ 2] Conley is an inmate at the State Penitentiary. In Conley's work area, prison officials found a blank State Penitentiary visitor's pass, a Heartview Foundation employee identification card bearing another person's name, and a laminated identification card with Conley's picture on it bearing another person's name and the warden's signature. Because of these items found in his work area, Conley was placed in an administrative detention cell in the orientation unit of the Penitentiary.

[¶ 3] State Penitentiary Captain Brian Jorgenson investigated the incident and decided to talk to Conley. Prison guards brought Conley in handcuffs, per prison policy, from the detention cell to a staff office to meet with Jorgenson. They told Conley Jorgenson was in the office and had requested Conley come to see him.

[¶ 4] Jorgenson and Conley, still handcuffed, sat across from each other with a desk between them. The door to the office was left open, and Jorgenson and Conley were the only two persons in the room. Jorgenson told Conley about the incident report, showed Conley a copy of it, and asked Conley to read it. Jorgenson testified that during this type of interview he would ask prisoners "if they have anything they want to say about the incident, whether they deny the incident or they say it's accurate, and let them know that I'm not the one finding them guilty or innocent on the report, but I'm just gathering the information for the adjustment com-

Rick Lee Volk (argued), Assistant State's Attorney, Bismarck, for plaintiff and appellee.

mittee if it goes to the adjustment committee." Jorgenson asked Conley questions about the incident, and Conley did not ask to leave during the 20 to 25 minute interview. After the interview, Jorgenson reviewed with Conley a notice of disciplinary hearing and gave him a copy.

[¶ 5] An adjustment committee hearing was later held in an office in the prison orientation unit next to the office where Jorgenson had interviewed Conley. Sean Conway, a case manager at the Penitentiary, chaired the meeting, and Mark Molesworth, a member of the adjustment committee, also attended. Charles Shumaker, an orientation unit immediate supervisor, attended the meeting as Conley's staff representative. Conley was again brought from the detention cell in handcuffs to the hearing room where he remained handcuffed during the hearing, per prison policy.

[¶ 6] At the start of the hearing, Conway gave Conley a form titled "Inmate Rights and Responsibilities When Before Adjustment Committee" that included advice to Conley: "You have the right to be present throughout this committee hearing" and "You have the right to remain silent. [A]nything you say may be used against you in our recommendations to the Warden." Conley reviewed the form and signed it without asking any questions. Conway then read the incident report to Conley and asked him whether the report was accurate. Conley replied the report was accurate and, during the proceeding, he admitted to possessing and manufacturing the items found at his work area.

[¶ 7] Later, Conley was criminally charged with violating NDCC 12.1–08–09 by possessing contraband useful for escape from detention. Conley moved to suppress the statements he made to prison officials because he had not been advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). After an evidentiary hearing, the trial court denied Conley's suppression motion. The court found Conley was not "in custody" during the initial interview with Jorgenson or at the adjustment committee hearing. The court reasoned, under the totality of the circum-

stances, "a reasonable person first of all would not think that they had to remain either in the interview or in the adjustment hearing, and that there was not an interrogation in the sense intended or discussed in the *Miranda* decision and its subsequent cases." Conley then entered a conditional plea of guilty under NDRCrimP 11(a)(2), reserving his right to appeal the trial court's denial of his suppression motion.

## II

[¶ 8] We affirm a trial court's decision on a motion to suppress unless, after resolving conflicting evidence in favor of affirmance, we conclude there is insufficient competent evidence to support the decision, or unless we conclude the decision goes against the manifest weight of the evidence. *State v. Hawley*, 540 N.W.2d 390, 392 (N.D. 1995). While we generally defer to the trial court's findings of fact on the circumstances of an interrogation, the ultimate question of whether a suspect is in custody and therefore entitled to *Miranda* warnings presents a mixed question of law and fact. *State v. Eldred*, 1997 ND 112, ¶ 9, 564 N.W.2d 283. As we said in *State v. Martin*, 543 N.W.2d 224, 226 (N.D.1996), the trial court's ultimate determination that questioning is investigatory in nature and not custodial is fully reviewable on appeal.

### A

[¶ 9] In *Miranda*, the United States Supreme Court held the prosecution cannot use statements stemming from the custodial interrogation of an accused unless it shows procedural safeguards effective to secure the privilege against self-incrimination. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612 (footnote omitted). Adequate procedural safeguards exist when the interrogating officer gives the now-familiar *Miranda* warnings.

[¶ 10] *Miranda* warnings are required only when the accused is in custody

or is otherwise deprived of his freedom of action in a significant way. *Id.* But *Miranda* warnings arose out of a concern for the inherent coerciveness that exists in situations where suspects, previously at liberty, are cut off from the outside world and placed in an antagonistic police-dominated environment. *See Miranda*, 384 U.S. at 457–58, 86 S.Ct. at 1618–19. These concerns decrease where officials question someone who is already serving a prison sentence. Because prisoner interrogation does not lend itself to easy analysis under the traditional formulations of the *Miranda* rule, a unique body of caselaw has developed about the need for *Miranda* warnings in a prison setting.

### B

[¶ 11] In *Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), the Supreme Court held incriminating statements made by a prison inmate to an Internal Revenue agent during in-prison questioning about possible criminal tax violations were inadmissible at the inmate's criminal trial. The government attempted to distinguish *Miranda* in the prison setting by arguing the custody the inmate faced at the time of questioning had arisen from another crime. The Court summarily rejected the argument, reasoning "[t]hese differences are too minor and shadowy to justify a departure from the well-considered conclusions of *Miranda* with reference to warnings to be given to a person held in custody." *Mathis*, 391 U.S. at 4, 88 S.Ct. at 1504–05. Still, most courts have refused to construe *Mathis* as creating a per se rule requiring *Miranda* warnings before any investigatory questioning of an inmate inside a prison.

[¶ 12] One of the leading cases in this area of the law declared a per se rule "would not only be inconsistent with *Miranda* but would torture it to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart." *Cervantes v. Walker*, 589 F.2d 424, 427 (9th Cir.1978). At 429, *Cervantes* teaches that, to determine whether a prison inmate is in custody within the principles of *Miranda*, an "added imposition on [the inmate's] freedom of movement" is necessary. Many opinions

have used this standard. *See particularly, Leviston v. Black*, 843 F.2d 302, 304 (8th Cir.), *cert. denied*, 488 U.S. 865, 109 S.Ct. 168, 102 L.Ed.2d 138 (1988). *See also United States v. Cheely*, 36 F.3d 1439, 1447 (9th Cir.1994), *cert. denied*, —— U.S. ——, 118 S.Ct. 253, 139 L.Ed.2d 181 (1997); *Garcia v. Singletary*, 13 F.3d 1487, 1490–91 (11th Cir.), *cert. denied*, 513 U.S. 908, 115 S.Ct. 276, 130 L.Ed.2d 193 (1994); *United States v. Conley*, 779 F.2d 970, 972 (4th Cir.1985), *cert. denied*, 479 U.S. 830, 107 S.Ct. 114, 93 L.Ed.2d 61 (1986); *United States v. Scalf*, 725 F.2d 1272, 1276 (10th Cir.1984); *United States v. Vasquez*, 889 F.Supp. 171, 175 (M.D.Pa.1995); *State v. Deases*, 518 N.W.2d 784, 789 (Iowa 1994); *People v. Patterson*, 146 Ill.2d 445, 167 Ill.Dec. 1045, 588 N.E.2d 1175, *cert. denied*, 506 U.S. 838, 113 S.Ct. 116, 121 L.Ed.2d 73 (1992); *Whitfield v. State*, 287 Md. 124, 411 A.2d 415, 424–26, *cert. denied*, 446 U.S. 993, 100 S.Ct. 2980, 64 L.Ed.2d 850 (1980). Applying this standard, courts have reached divergent results when considering whether a prisoner is in custody for *Miranda* purposes when questioned in a prison setting. *Compare* Annot., *What constitutes "custodial interrogation" within rule of Miranda v Arizona requiring that suspect be informed of his federal constitutional rights before custodial interrogation*, 31 A.L.R.3d 565, § 16[a] and [b] (1970), and cases there collected. Incarceration does not automatically make an inmate in custody for *Miranda* purposes. Some added restriction on the inmate's freedom of movement during the interrogation itself must exist.

[¶ 13] The essential inquiry is whether a reasonable person in the inmate's position would understand himself to be in custody. *See, e.g., Leviston*, 843 F.2d at 304. As *Cervantes*, 589 F.2d at 427–28 explains, relevant factors for this determination include the language used to summon the individual, the purpose, place and manner of the interrogation, the extent that the defendant is confronted with evidence of his guilt, and whether the defendant is free to leave the place of questioning. As explained in *Singletary*, 13 F.3d at 1492, courts must always consider the totality of the circumstances surrounding the alleged interrogation. If a prisoner makes a challenged statement when

he was not subjected to more than the usual restraint on a prisoner's freedom of movement, the prisoner is not in custody and *Miranda* warnings are not required.

### C

[¶ 14] Conley relies on several factors to support his argument he was in custody for *Miranda* purposes during the initial interview by Jorgenson. Conley argues he was the only suspect in the prison officials' investigation and he remained handcuffed from the time he was taken from his cell throughout the questioning in Jorgenson's office. The questioning was not "on the scene" or spontaneous, Conley argues, and he was not interviewed by prison officials in his own cell or in an open area, but in the closed confines of Jorgenson's office. Conley further alleges it was not until questioning began that he was confronted with incriminating evidence against him. Conley argues he was not afforded the freedom of movement given other prisoners at the Penitentiary because he was held in segregation for the very actions being investigated. Conley claims, under the *Cervantes* standard, a reasonable person in his position would have believed he was restricted in his freedom of movement beyond the normal prison confinement, and he therefore was in custody for *Miranda* purposes when he was initially questioned about possession of the contraband. We agree.

[¶ 15] The State attempts to portray Jorgenson's initial meeting with Conley as merely an information-gathering interview. The State asserts Jorgenson asked Conley to come and see him, but did not order him to do so or to answer any questions. What the State ignores is, when the contraband was found at Conley's work station and he was placed in administrative segregation, there was probable cause to believe that Conley had not only committed a disciplinary violation, but also a clear violation of the criminal law. *See United States v. Cadmus*, 614 F.Supp. 367, 373 (S.D.N.Y.1985) (alternate holding). Indeed, possessing contraband useful for escape from official detention is a felony in this state. NDCC 12.1–08–09. Jorgenson therefore knew, at the time he began

questioning Conley, there had been a likely violation of the criminal law. Apparently, no other inmate was investigated for this incident. The purpose of the questioning was therefore not to generally investigate, but rather to find out the nature and extent of Conley's culpability. *See Deases*, 518 N.W.2d at 789. Jorgenson's request to visit with Conley cannot be considered merely a request Conley could freely decline when he was administratively segregated for the conduct that was the topic of the interview and brought to the interview in handcuffs. At the interview, Conley was asked whether he "den[ied] the incident."

[¶ 16] The State downplays the handcuff restraints during the interview as not being unexpected by Conley because this was the prison's policy when an inmate was administratively detained. *Compare Conley*, 779 F.2d at 973 (where handcuffs and restraints were standard procedure for transferring inmates to infirmary or elsewhere in prison, handcuffs were not an "added imposition" under *Cervantes* test that put inmate in custody for *Miranda* purposes). But considering the purpose of the interview and the evidence presented there against him, we believe Conley was further restricted by the continued handcuffing.

[¶ 17] Under the totality of the circumstances, we conclude a reasonable prisoner in Conley's situation would have believed himself to be in custody for *Miranda* purposes during the initial interview with Jorgenson.

### D

[¶ 18] Quite apart from the situation where inmate questioning occurs "on the scene" within the general prison setting, another body of caselaw has developed with respect to the necessity of *Miranda* warnings at prison disciplinary proceedings. It is well settled *Miranda* does not apply to interrogations for an internal disciplinary proceeding that is not a violation of the criminal law. *See* 1 M. Mushlin, *Rights of Prisoners* § 9.19 (2d ed.1993) and cases there collected. However, courts have developed a dual approach to analyzing the in-between situation where a defendant's responses at a disciplinary proceeding when *Miranda* warnings are

not given but are subsequently used at a criminal trial on charges stemming from the incident that was the subject of the disciplinary hearing.

[¶ 19] Rather than applying the *Cervantes* "added imposition" analysis, some courts have held incriminating statements made at a prison disciplinary hearing are simply inadmissible at a later criminal trial absent a *Miranda* warning at the disciplinary hearing. For examples, *see Clutchette v. Procunier,* 497 F.2d 809, 823 (9th Cir.1974), *rev'd on other grounds, Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *Grant v. State,* 154 Ga.App. 758, 270 S.E.2d 42, 43 (1980); *State v. Harris,* 176 Mont. 70, 576 P.2d 257, 258 (1978). Other courts have reached the same result through a different analysis, implying an immunity against the affirmative use in any later criminal proceeding of incriminating statements made by the defendant in the prison disciplinary hearing. For examples, *see Sands v. Wainwright,* 357 F.Supp. 1062, 1092–93 (M.D.Fla.1973); *Carter v. McGinnis,* 351 F.Supp. 787, 795 (W.D.N.Y.1972); *McGinnis v. Stevens,* 543 P.2d 1221, 1233–35 (Alaska 1975); *People v. Carr,* 149 Mich.App. 653, 386 N.W.2d 631, 634 (1986); *Avant v. Clifford,* 67 N.J. 496, 341 A.2d 629, 653 (1975). Analogizing to cases that have forbidden the use of testimony at a criminal trial given at a previous parole or probation revocation proceeding, these courts recognize the "Catch 22" choice facing inmates who can either testify at the prison disciplinary hearing and incriminate themselves, or forego the right to offer exculpatory or mitigating statements and face the potential penalties for prison misconduct based on evidence that they cannot refute or explain. These courts reason testimony from the disciplinary hearing cannot be used at a later criminal trial, not because *Miranda* warnings were required at the disciplinary hearing, but because of the intolerable situation created when one constitutional right has to be surrendered to assert another. These courts have used their inherent supervisory powers to create an immunity against the affirmative use of the testimony in a later criminal trial. *Compare Baxter v. Palmigiano,* 425 U.S. 308, 316, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1976) ("Prison

disciplinary hearings are not criminal proceedings; but if inmates are compelled in those proceedings to furnish testimonial evidence that might incriminate them in later criminal proceedings, they must be offered 'whatever immunity is required to supplant the privilege' and may not be required to 'waive such immunity.'"). As explained in *Sands,* 357 F.Supp. at 1093, this rule accommodates the interests of both sides as well as justice because the "inmate is free to be heard in his defense in the disciplinary proceedings while the state is free to promote prison discipline and to protect its interest in the prosecution of crime."

[¶ 20] This court has ruled testimony given by the accused at a probation or parole revocation hearing cannot be used directly at a subsequent criminal trial on the substantive charge, but can be used only for impeachment purposes. *State v. Hass,* 268 N.W.2d 456, 460 (N.D.1978). The situation in this case has similarities with *Hass,* but we have not taken the further step to apply the *Hass* rationale to statements made in a prison disciplinary hearing.

### E

[¶ 21] Conley argued to the trial court *Miranda* warnings were required at the adjustment committee hearing, thereby rendering incriminating statements he made there inadmissible at his criminal trial. The State argued to the trial court the *Cervantes* standard governed the necessity of *Miranda* warnings at the adjustment committee hearing. Although he made the argument on appeal, Conley did not assert to the trial court that he should be given immunity for any affirmative use of his testimony at the criminal trial. When a defendant fails to argue a position on a pretrial motion to suppress, and does not attempt to show just cause for the untimely presentation of the position here, we will decline to consider the merits of that position. *See State v. Sadek,* 552 N.W.2d 71, 73 (N.D.1996). We therefore limit our review to Conley's position presented to the trial court, *i.e.,* whether, under the totality of the circumstances, Conley was in custody for *Miranda* purposes during the adjustment committee hearing.

[¶ 22] We conclude Conley was in custody for *Miranda* purposes during the adjustment committee hearing for many of the same reasons he was in custody during the initial interview with Jorgenson. Again, Conley was handcuffed and brought from administrative segregation to appear at a hearing on the same incident that led to imposition of the additional restraints. The State argues Conley was given advanced notice of this administrative "interview" with Conway, and was only requested, but not ordered, to attend. The State also argues Conley, upon arriving at the hearing, was advised of his right to be present at the hearing, thereby impliedly informing him of his right not to attend the hearing, and of his right to remain silent.

[¶ 23] Conley was the sole suspect for possession of this contraband, and he was confronted with the evidence against him at the hearing. The disciplinary hearing was conducted by prison officials to ascertain inmate responsibility and to impose discipline for the violation. *See Harris,* 576 P.2d at 258. The possibility of a criminal violation was, if anything, clearer at this point than at the earlier interview with Jorgenson. Indeed, it appears the only recommendation the adjustment committee made to the Warden after the hearing was that the incident report be forwarded to the prosecutor's office for possible criminal charges.

[¶ 24] Disciplinary committee questioning directed at an accused inmate is generally considered custodial interrogation requiring compliance with *Miranda* if criminal charges are a realistic possibility. *See Stevens,* 543 P.2d at 1234. As the court concluded in *Clutchette,* 497 F.2d at 823:

> A disciplinary hearing is inherently inquisitive. It is designed to induce revelation of all the facts, including the accused inmate's version of them. The prison disciplinary hearing forces the prisoner into a situation of "interrogative custody," and the prison authorities must safeguard the inmate's privilege against self-incrimination.

[¶ 25] The trial court found there was "no question" Conley was not informed of all of the *Miranda* rights. The State does not argue there was compliance with *Miranda*.

The warning in the adjustment committee hearing did not inform Conley his statements could be used in a court of law on criminal charges, and by negative implication, may have misled him into believing his statements could not be used in court. As the court said in *United States v. Tillman,* 963 F.2d 137, 141 (6th Cir.1992), "[o]f all of the elements provided for in *Miranda,* this element is perhaps the most critical because it lies at the heart of the need to protect a citizen's Fifth Amendment rights."

[¶ 26] We conclude, under the totality of the circumstances, a reasonable prisoner in Conley's position would believe he was in custody for *Miranda* purposes during the adjustment committee hearing, and the failure to advise him of his *Miranda* rights makes his incriminating statements inadmissible at his criminal trial.

### III

[¶ 27] We reverse the criminal judgment and remand to give Conley an opportunity to withdraw his guilty plea.

[¶ 28] MARING and NEUMANN, JJ., concur.

VANDE WALLE, Chief Justice, concurring in the result.

[¶ 29] Under the facts of this case, I agree with the result reached by the majority opinion. I write separately to note that insofar as the majority opinion may appear to rely on the fact Conley was the "focus" of the investigations as the reason to require the *Miranda* warnings, we have clearly held that "[m]ere investigatory focus does not require the giving of the *Miranda* warnings." *State v. Fields,* 294 N.W.2d 404, 406 (N.D.1980).

[¶ 30] Some of the cases from other jurisdictions, cited in the majority opinion, such as *State v. Deases,* 518 N.W.2d 784, 789 (Iowa 1994), do note the defendant "was the only inmate involved ... and promptly became a suspect ...," I do not understand that recitation to be any more than one factor in determining whether "a reasonable

person would have believed himself to be in custody." *Id.* at 790.

[¶ 31] Dale V. Sandstrom